UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 23-cr-394 (TNM) |
| : | |
| MICHAEL STEWART (8), : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Michael Stewart pled guilty to a two-count information, charging him with Conspiracy to Distribute and Possess with Intent to Distribute 400 Grams or More of a Mixture or Substance Containing a Detectable Amount of Fentanyl and a Mixture or Substance Containing a Detectable Amount of Heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi), 841(b)(1)(C), and 846 (Count One); and Conspiracy to Distribute and Possess with Intent to Distribute 500 Grams or More of a Mixture or Substance Containing a Detectable Amount of Cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii), and 846 (Count Two). For the reasons herein, the Government respectfully requests that the Court sentence the Defendant to the midpoint of the Defendant's applicable Guidelines range, followed by five years of supervised release.

**FACTUAL AND PROCEDURAL BACKGROUND**

The Defendant's admitted conduct is part of a broader, multi-year federal investigation. Specifically, the Drug Enforcement Administration commenced an investigation into a drug-trafficking organization that imports into the United States and redistributes fentanyl, cocaine, and other controlled substances. Through the investigation, including wiretap interceptions of the Defendant and his co-conspirators, law enforcement was able to identify the Defendant and others as being involved in this drug trafficking operation. From no later than July 2021 and continuing

until his arrest in November 2023, the Defendant conspired to, and did in fact, distribute and possess with intent to distribute fentanyl and cocaine base. In aggregate, the converted drug weight for the amount of said mixtures and substances, including the reasonably foreseeable conduct of all the members of the conspiracy known to the Defendant, was no less than 3,000 kilograms but no greater than 10,000 kilograms of converted drug weight.

The Defendant's orientation in the conspiracy was to serve as a redistributor of fentanyl and cocaine supplied by other participants in the conspiracy. Specifically, the Defendant acquired wholesale quantities of cocaine and fentanyl, including from co-conspirators Kevin Quattlebaum and Ronnie Rogers, which he in turn cut, repackaged, and then sold in smaller quantities to other drug traffickers for redistribution both in and around the District of Columbia.

For example, on September 7, 2022, Quattlebaum called the Defendant to arrange a delivery of powdered cocaine to the Defendant. During the call, the Defendant told Quattlebaum: "I need you[r] like cooked food, man." Quattlebaum then clarified: "the soft way?" The Defendant confirmed: "Yeah. So I am getting ready, huh?" Quattlebaum then offered an additional type of cocaine: "I got the hard way whipped, too." The Defendant declined, stating: "Nah, I don't need that Kevo, I don't need that. Yeah I don't need that." The two then coordinated a meeting, which took place later that day. In this intercepted communication, which is reflective of the general relationship between Quattlebaum and the Defendant, the "soft way" (powdered) and "hard way" (crack) refer to different preparations of cocaine. Thus, during the call, the Defendant solicited powdered cocaine from Quattlebaum and declined Quattlebaum's offer of cocaine base at that time.

The Defendant's relationship with and reputation amongst his co-conspirators is also illustrated through intercepts obtained over the course of the conspiracy. For example, during an

intercepted telephone call on March 19, 2023, Rogers and Quattlebaum discussed the Defendant's drug trafficking. During that call, Rogers asked Quattlebaum "can you, can you bring me that uh." Quattlebaum then interjected, instructing Rogers to "just text it to me, I'll come." Rogers agreed, stating "alright, come on, come on. I'm in Maryland, I'm in the house in Maryland." In then clarifying what type of product Rogers wanted, Quattlebaum then also alluded to the co-conspirators' relationship with the Defendant: "okay, just text me, say your way or Mike way. My way or Mike Way." Rogers replied: "Mike way, Mike way." In this context, "Mike's way" is the Defendant's preferred type of cocaine, powdered, rather than the crack cocaine ("my way") that Quattlebaum also trafficked. In total, the Defendant accepted responsibility for selling at least one-half ounce to an ounce of powdered cocaine per month, every month, over the course of the conspiracy. The Defendant most regularly purchased ounces of cocaine from Quattlebaum, and then broke down the powdered cocaine into gram and half-gram quantities in order to enhance his profits from cocaine sales.

Beyond intercepted calls, the Defendant also directly sold fentanyl in controlled law enforcement purchases over the course of the conspiracy. Specifically, the Defendant participated in seven controlled purchases of fentanyl, from July 2021 to September 2022. In total, the Defendant sold approximately 320 grams of fentanyl, which the Defendant marketed as heroin, over the course of the controlled purchases.

At least two of the seven controlled purchases of fentanyl conducted by the Defendant were supplied by his co-defendant Rogers. For example, on August 24, 2022, law enforcement began intercepting electronic and wire communications coming to and from the Defendant's telephone. On September 8, 2023, law enforcement conducted a controlled purchase of 60 grams of fentanyl from the Defendant. Immediately after the 60 grams of fentanyl was ordered from the Defendant,

the Defendant contacted Rogers and requested the same amount of fentanyl he acquired from Rogers for a July 27, 2022 controlled purchase, also for 60 grams of fentanyl that was represented to be heroin.

## STATUTORY PENALTIES

Pursuant to Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846, Count One of the Superseding Information carries a mandatory minimum term of ten years of imprisonment and a maximum term of life imprisonment, a fine not to exceed $10,000,000, and a term of supervised release of at least five years.

Pursuant to Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), and 846, Count Two of the Superseding Information carries a mandatory minimum term of five years of imprisonment and a maximum term of 40 years imprisonment, a fine not to exceed $5,000,000, and a term of supervised release of at least four years.

## SENTENCING GUIDELINES

The Government concurs with the Pre-Sentence Report's (the "PSR") calculation that the Defendant has zero criminal history points, resulting in a Criminal History Category of I under the United States Sentencing Guidelines (the "Guidelines"), and thus making him eligible for a zero-point offender adjustment under U.S.S.G. § 4C1.1. PSR at ¶¶ 61, 63-81.

The Government also concurs with the PSR that the Defendant's base offense level for Counts One and Two is 32, before any downward adjustments, and that the Defendant accepted responsibility early enough in the case so as to qualify for a three-point reduction to his offense level. PSR at ¶¶ 52-57. Thus, based upon the final PSR released on October 29, 2025, the resultant total offense level of 27, along with a Criminal History Category of I, results in a corresponding range of imprisonment for Counts One and Two under the Guidelines of 70 months to 87 months,

with a mandatory minimum of 120 months of imprisonment to be imposed absent any statutory basis for relief from the statutory mandatory minimum.

## LEGAL PRINCIPLES

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a). *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *United States v. Rita*, 551 U.S. 338, 348-50 (2007). The Section 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the kinds of sentences available; (4) the sentencing range established by the Sentencing Guidelines; (5) any related Sentencing Commission policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need for restitution to any victims.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 542 U.S. 296 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory. *Booker*, 543 U.S. at 245. Nonetheless, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *See Gall*, 128 S. Ct. at 598 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark"). The Guidelines are the product of careful study based on extensive empirical

evidence derived from the review of thousands of individual sentencing decisions. *See Rita*, 551 U.S. at 338; *see also* United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); 28 U.S.C. § 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 438 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). In addition, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." *Booker*, 543 U.S. at 264 (the Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). Any Guidelines calculation is based on the individual characteristics of the offense and the offender, as required by Section 3553(a)(1). The Guidelines themselves thus seek to implement—in a fair and uniform way—the offense specific characteristics that, themselves, comprise the "individualized assessment" the Supreme Court commends in *Gall*. *See Gall*, 552 U.S. at 50.

## ARGUMENT

A sentence at the midpoint of the Defendant's resultant Guidelines range is appropriate in light of the seriousness of the offense. The Government's recommended sentence is also designed to deter others, promote respect for the law, and offer rehabilitation to the Defendant.

### 1. The Nature, Circumstances, and Seriousness of the Offense

The count to which the Defendant pleaded guilty is serious. The Defendant was a member

of a large drug trafficking conspiracy involving at least eight individuals, as reflected in the indictment in this case. The Defendant has agreed that he is accountable for distributing and possessing with the intent to distribute bulk quantities of fentanyl and cocaine.

The Defendant's ongoing participation in a multi-year drug trafficking conspiracy demonstrates that the Defendant was indifferent to the destruction he and his co-conspirators were causing to the users of their illegal narcotics and to the community at large. Both fentanyl and powdered cocaine are significant barriers to individual and communal prosperity, public health, and community safety. Drug abuse and addiction contributes to the decay of our society and community and accounts for tens of thousands of deaths in this country each year. The will of the Defendant to continually make himself an available gateway for these drugs to enter the community shows his clear disregard for the individuals in the community and his paramount desire to make personal profit. Indeed, the Court need consider no more than the Defendant's own words to validate this assertion. During an August 17, 2021 controlled purchase of fentanyl from the Defendant, he concluded the transaction by boasting that he had sold approximately 80 grams of narcotics already that day, declaring, "that's what I do."

2.   **The Defendant's History and Characteristics**

While the parties agree that the PSR accurately computes the Defendant's criminal history score, the vagaries of how prior convictions are scored under the Guidelines result in a criminal history category that understates the Defendant's lengthy criminal history. The Defendant's adult criminal history dates back to 1984, when he was convicted at trial of murder and robbery in Montgomery County Circuit Court. PSR at ¶ 66. The Government acknowledges that this prior conviction is properly scored in the PSR for purposes of criminal history points under the Guidelines. The Government further acknowledges that the Defendant's murder conviction did not result from the most traditional set of facts. Nevertheless: the Defendant participated in an

armed robbery where the victim ultimately died from a stress-induced heart attack brought about by the Defendant's actions.

In addition to the Defendant's prior convictions, he has numerous prior arrests that reinforce the perception of the Defendant's recidivism. Specifically, the Defendant has been arrested seventeen additional times that did not result in convictions, including for assault with the intent to murder, armed robbery, and other offenses. PSR at ¶¶ 71-87.

### 3. The Need to Promote Respect for the Law and Deterrence

The Defendant's sentence should reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2). Perhaps more than any other factor, the need to deter narcotics trafficking of dangerous drugs weighs most heavily in favor of a sentence within the applicable guidelines range. As the Court is well aware, drug trafficking is an inherently dangerous business, even beyond the second-order effects on the community. Given the attendant harms to the community, the Defendant's sentence should disincentivize others from engaging in similar criminal conduct.

### 4. Other factors

Given the catastrophic impact of drugs on our community, a sentence at the midpoint of the Defendant's applicable Guidelines range of imprisonment is warranted. Too many people do not understand or fear the consequences to themselves or their community that flow from this behavior, and they must understand that profiting off their fellow community members' addiction is unacceptable.

Further, the Government's requested sentence will hopefully provide the Defendant the skills and incentives he needs to make better choices and avoid criminal behavior in the future. Specifically, it will provide the Defendant with an adequate amount of time to take advantage of many of the programs offered by the Bureau of Prisons (BOP). These programs are designed to

provide the Defendant with these aforementioned skills to hopefully discourage recidivism and re-enter society as a contributing member. The Probation Office has researched and identified available programs within the BOP, and the Government hopes that the Defendant will take full advantage of those programs during his incarceration. PSR at ¶ 144.

## CONCLUSION

The Defendant participated in a drug trafficking conspiracy that flooded the community with cocaine, fentanyl, and other extremely addictive narcotics. The Defendant accepted responsibility for his participation therein, including the trafficking of kilogram quantities of these narcotics. The Defendant's conduct is serious and merits a commensurate sentence. The Government respectfully recommends that the Court sentence the Defendant to the midpoint of his applicable Guidelines range, followed by five years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: /s/ Matthew W. Kinskey
MATTHEW W. KINSKEY
GEORGE P. ELIOPOULOS
Assistant United States Attorneys
D.C. Bar No. 1031975 (Kinskey)
D.C. Bar No. 390601 (Eliopoulos)
United States Attorney's Office
Violent Crime & Narcotics Trafficking Section
601 D Street, NW
Washington, D.C. 20530